[Cite as *State v. Rider*, 2022-Ohio-1964.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CHAMPAIGN COUNTY**

|  |  |  |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2021-CA-12 |
| | : | |
| v. | : | Trial Court Case No. 2020-CR-194 |
| | : | |
| VALERIE LYNN RIDER | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 10th day of June, 2022.

. . . . . . . . . . .

JANE A. NAPIER, Atty. Reg. No. 0061426, Champaign County Prosecutor's Office, 200 North Main Street, Urbana, Ohio 43078
      Attorney for Plaintiff-Appellee

L. PATRICK MULLIGAN, Atty. Reg. No. 0011618, FRANK MATTHEW BATZ, Atty. Reg. No. 0093817 and LAURA M. WOODRUFF, Atty. Reg. No. 0084161, 24 North Wilkinson Street, Dayton, Ohio 45402
      Attorneys for Defendant-Appellant

. . . . . . . . . . . . .

TUCKER, P.J.

{¶ 1} Defendant-appellant Valerie Lynn Rider appeals from her convictions for felony murder, felonious assault, and other offenses and specifications. She asserts that the trial court erred in instructing the jury. Rider further asserts that the State did not present evidence sufficient to sustain the convictions and that the convictions were against the manifest weight of the evidence. Finally, Rider asserts that she was denied the effective assistance of counsel. For the reasons that follow, we affirm.

## I. Facts and Procedural History

{¶ 2} This case arises from the September 30, 2020 death of Whitney Hostler. At the time of her death, Hostler and her two-year old child resided in the home of Valerie Rider and her husband, Rodney Rider, Sr. (Rodney Sr.), along with Rider's sons, Randy Rider and Rodney Rider, Jr. (Rodney Jr.). Randy is the father of Hostler's child.[1]

{¶ 3} Following an investigation, Valerie was indicted on one count of aggravated murder in violation of R.C. 2903.01(A), one count of felony murder in violation of R.C. 2903.02(B), one count of felonious assault in violation of R.C. 2903.11(A)(1), one count of tampering with evidence in violation of R.C. 2921.12(A)(1), one count of gross abuse of a corpse in violation of R.C. 2927.01(B), and three counts of possessing criminal tools in violation of R.C. 2923.24(A). Each of the counts of possessing criminal tools, tampering with evidence, and gross abuse of a corpse carried a one-year firearm specification.

---

[1] For ease of reference, we will refer to the Riders by their first names in this opinion.

{¶ 4} A jury trial began on February 22, 2021. During the trial, the State presented the testimony of Randy Rider, who testified that although he had been living with his parents and Hostler, he had become involved with another woman with whom he was expecting a child. Randy testified that he had been absent from the Rider residence in the week prior to Hostler's death, but he returned to the residence at approximately 10:00 a.m. the day of her death. According to Randy, Hostler was angry about his new relationship and had made plans to move out of the Rider residence. He testified that when he arrived at the house, Hostler "stormed off" to her bedroom to continue packing. Randy testified that he then told his mother that Hostler was moving out that day and taking the child with her. His mother went to Hostler's bedroom. Randy testified that he heard Hostler and his mother yelling at each other because Hostler was still upset with him. He testified that it was normal for his mother to attempt to calm others down.

{¶ 5} Randy testified that his father had woken up approximately five minutes after his mother had entered Hostler's bedroom. His father asked him why Valerie and Hostler were arguing. Randy informed his father that Hostler was leaving with the child and that they probably would not get to see the child "until we start custody battles or something." Tr. p. 147. Randy testified that his father immediately became angry and told Randy to work things out with Hostler. His father also "poked" him on the forehead and stated that he (father) "should shoot" Randy. Tr. p. 148. Randy's father then walked off toward Hostler's bedroom. Approximately 10 minutes later, Randy's father walked toward him, grabbed his arm, and told him he needed to leave. According to Randy, his father's demeanor had changed; he had tears in his eyes and was no longer angry. Randy asked

his father what was wrong and what had happened. His father responded that he had not done anything and told Randy to get out now.

{¶ 6} Randy testified that his mother then approached him and stated that Hostler wanted Randy to leave. Randy noticed that his mother had Hostler's cell phone and asked her why she was holding it. According to Randy, his mother responded that Hostler wanted her to text Hostler's friend, Elgin Channels, who was going to help Hostler move out of the Rider residence later that day. Valerie stated that Hostler had told her to text Channels and tell him not to come. Valerie informed Randy that Hostler had agreed to stay in the residence if Randy left. Randy testified that his father was pushing him toward the door while Randy was putting on his shoes. As Randy walked out, his father told him to go "somewhere where people know you." Tr. p. 153.

{¶ 7} Randy testified that he left the residence and went to the home of his friend, Logan Short. He arrived at Short's home around 11:30 a.m. While there, Randy's girlfriend came over, and the group discussed what had occurred at the Rider residence. The group discussed making a report to the police but did not do so until sometime between 11:00 p.m. and midnight.

{¶ 8} The State also presented the testimony of Rodney Sr., who testified that he had been asleep when Randy arrived at the residence. He testified that he woke up when he heard Randy and Hostler yelling at each other. Rodney testified that Hostler mentioned leaving with the child. According to Rodney, he left his bedroom to walk to the bathroom, at which time he observed Valerie and Hostler in Hostler's bedroom. He testified he left the bathroom and joined Randy and the child in the living room and that

he "had a few words" with Randy.   Tr. p. 210.

**{¶ 9}** Rodney testified that Valerie had called for him so he went back to help calm Hostler.   When he entered the bedroom, he observed Hostler sitting on the bed.   Hostler was crying, and Valerie stated that Hostler was considering whether to stay.   Hostler then stated she wanted Randy to leave.   Rodney testified that he went to the living room and told Randy that he needed to leave and let Hostler calm down.   Rodney testified that, after Randy left, he took the child back to a bedroom, where they went back to sleep.

**{¶ 10}** Rodney testified that he woke up several hours later and walked out of the bedroom to find Valerie dragging a green duffel bag.   Valerie stated that she and Hostler had had an argument and Hostler was dead.   Rodney opened the duffel bag and observed a plastic trash bag over Hostler's head with duct tape wrapped around her neck. He also noted a large black plastic bag on Hostler's body.   According to Rodney, he attempted to remove the bag from Hostler's head but was unable to do so because there were layers of duct tape around Hostler's neck.   Rodney testified that he used his pocketknife to cut through the tape and that he cut Hostler's hair in the process.

**{¶ 11}** Rodney testified that Valerie told him to move their pickup truck to the back of the house.   Rodney moved the truck, opened its tailgate, and backed the vehicle up to the back door of the house.   The bed of the truck had a cap top with windows.   He testified that Valerie swung the body into the truck bed, and he then moved the truck back to the front of the home; he backed the truck up to the rear of another vehicle.   Rodney testified that Valerie had stated that he never parked the truck in that manner, and she told him to park it so the front of the truck was facing the house.

{¶ 12} Rodney testified that they remained home with the child until their son, Rodney Jr., arrived home from work; the couple then told their son they were going out to scout possible sites for the upcoming deer-hunting season. Rodney testified that the couple took the child with them and drove around for 6-7 hours looking for a spot to dump the body. He testified that there were several spots they initially thought could be appropriate to deposit the body; however, they had to abandon each spot because vehicles appeared. Eventually, they went to Kiser Lake Road and parked by a steep ravine. Rodney testified that Valerie had pulled the duffel bag onto the tailgate; she then unzipped the bag, and they removed the body. While Valerie dragged Hostler's body down the hill, Rodney picked up the plastic bags and the duffel bag, which he placed in the truck bed. During this time, Rodney was armed with a handgun for which he had a concealed carry license. Rodney testified that his wife was aware of the gun. Rodney testified it took approximately five minutes to drive home from the dump site. When they arrived home, they were met by two deputies from the Champaign County Sheriff's Office.

{¶ 13} Elgin Channels also testified as a witness for the State. According to Channels, he and Hostler had been friends, and he had informed her that he would help her move from the Rider home. He further testified that Hostler had called him the morning of her murder and asked him to come to the residence to get her and the child. Channels testified that he had been running errands when Hostler called. He indicated the move had not been planned for that day, but Hostler was stressed and stated that she could not remain in the residence. Channels testified that he had planned to go to the residence after completing his errands, but at approximately 10:30 a.m., he received a

text purportedly from Hostler which stated "[n]ever mind. Still packing. Will leave tomorrow." Tr. p. 291.

{¶ 14} Channels testified that he had immediately texted Hostler to ask if she was sure she did not want to leave. He had no further communication with her. At approximately 11:00 p.m., he received, but did not answer, two calls from an unknown number, which he later discovered belonged to Randy's girlfriend. Then he received a text from the same number. The text stated, "[i]t's Randy. Have you heard from Whitney?" Tr. p. 301. Channels texted back and stated he had not heard from Whitney since the morning. He also asked whether Randy had heard from her. Randy replied negatively and indicated he was going make a police report.

{¶ 15} The State also presented the testimony of Champaign County Sheriff Deputies Daniel Fischer and Chris Culler. The deputies responded to the sheriff's office on the night of the murder to meet with Randy. Following the meeting, the deputies went to the Rider residence where they met Rodney Jr. The deputies asked Rodney Jr. if Hostler was home, and Rodney stated that he did not think she was there. They then asked if his parents were home. Rodney looked toward the area where the family parked their vehicles and then stated, "actually, no." Tr. p. 325. Rodney indicated that he had arrived home from work around 4:00 p.m., at which time his parents had informed him that Randy and Hostler had been fighting. His parents told him Hostler left after the argument. Rodney stated that he ate dinner and then his parents left with the child. According to Rodney, his parents told him they were going to scout for hunting sites.

{¶ 16} The deputies were about to leave the property when they observed a truck

coming toward the house. The truck stopped in the roadway for a moment and then pulled up to the house. Rodney Sr. was driving. The deputies informed Rodney Sr. and Valerie that they were investigating a complaint regarding Hostler's welfare. The couple informed the deputies that Randy and Hostler had been in an argument and that Hostler had later left in a red car that had pulled up to the home around 2:00 p.m. When asked where they had been, Valerie told the deputies that she and Rodney Sr. had driven to a gas station in New Carlisle, which was about 40 minutes away from their home, in order to purchase Cherry Coke. Valerie also informed the deputies she had received a text from Hostler's number advising her that Hostler was "going away." Tr. p. 329.

{¶ 17} Dep. Fischer walked around the truck, looked in the windows, and observed the bags and the duct tape. When asked about those items, Rodney Sr. became extremely nervous. Valerie, who remained calm throughout the encounter, stated that it was merely trash. The deputies then asked for and were granted permission to look in the truck and the house. Fischer looked in the truck and noted that there was hair stuck to the duct tape. He also observed a two-wheel dolly with muddy tires and a flip-flop sandal. A green rubber glove was recovered from the console area of the truck cab.[2] Dep. Culler recovered a "mostly used roll of duct tape" from Hostler's bedroom. Tr. p. 357. When asked about the hair on the duct tape, Valerie responded that she had been cleaning all day and that her granddaughters tended to lose a lot of hair. At this point, Rodney Sr. was sitting on the porch shaking, rocking, and hyperventilating.

{¶ 18} Champaign County Sheriff's Deputy Brandon Fenwick testified that he was

---

[2] The glove was tested for DNA. Valerie's DNA was found inside the glove while Hostler's DNA was found on the outside.

on patrol on October 1, 2020, at approximately 5:13 p.m. when he was dispatched to Kiser Lake Road to investigate a report of a body found by the road. Fenwick testified that he arrived at the location and met a person who had noticed the body while out walking his dog. Fenwick was able to see the body from the top of the hill. He also testified that the hill was very steep, and he had to use a rope to get to the body. The body was later identified as Hostler.

{¶ 19} Mary Goolsby, M.D., a deputy coroner and forensic pathologist at the Montgomery County Coroner's Office, also testified. Goolsby had performed an autopsy on Hostler's body and had determined that her death was caused by "asphyxia due to manual strangulation and smothering." Tr. p. 435. She further testified the death was "contributed to by blunt force injuries of the head." *Id.* Goolsby testified that there were two abraded lacerations on the back of Hostler's head that extended down to her skull; the lacerations were caused by either a hard object hitting the head or the head striking a hard surface. She testified the lacerations had been made before or around the time of Hostler's death because there was evidence of bleeding. Hostler also had a "black eye" caused by a blunt impact. Tr. p. 439. There were bruises on Hostler's neck and abrasions on her chin. Goolsby testified that her physical examination findings were consistent with strangulation caused by pressure applied to Hostler's neck.

{¶ 20} Champaign County Sheriff's Chief Deputy Eric Holmes testified that he had interviewed Valerie after advising her of her rights. In the interview, Valerie initially denied any involvement in Hostler's death. However, she eventually admitted that she had been involved in an altercation with Hostler during which Hostler had said she was

moving out. Valerie stated that she asked Hostler to leave the child with her, but Hostler refused and stated that the Riders would never see the child again. Valerie stated that Hostler had hit her and had begun to walk past her when Valerie grabbed Hostler around the neck. Valerie indicated that Hostler had struggled, and Rider had loosened her grip for a moment. Hostler then began to scream and said she was going to call the police. Valerie stated that, at some point, she and Hostler had been on the bed; Hostler was facedown, and Valerie had had her arm around her. Valerie indicated that her arm had slipped upward and she "must have squeezed too hard," because she heard Hostler make a strange noise like a growl and then Hostler quit breathing. Tr. p. 484.

{¶ 21} The defense presented Logan Short as its first witness. Short testified that he was Randy's best friend and had known him for most of his life. According to Short, Randy had a "violent side" and called himself "the Reaper." Tr. p. 529. Short testified that he was asleep on the day of the murder when Randy knocked on his bedroom window between 10:30 and 11:00 a.m.; Randy was frantic and panicked. After talking to Randy, Short advised him to go to the police. However, Randy did not want to do so. At some point, Randy's girlfriend joined them and they continued to discuss going to the police. Short testified it was 10:00 p.m. when Randy finally agreed to go to the police.

{¶ 22} The defense also presented the testimony of David Rider, another Rider son, who testified that Randy had "anger tendencies" and that Randy and Hostler were always angry and violent with each other. Tr. p. 577. David testified that he had been on a video call with his mother and his sister between 11:00 a.m. and noon on the day of Hostler's death; he had been able to observe his father in the background and believed

that he had observed Randy walk by. According to David, Valerie stated that Randy and Hostler had been arguing.

{¶ 23} Valerie's daughter, Megan Caudill, was also called by the defense. She described Randy as "very hateful." Tr. p. 599. She also testified that Randy and Hostler were violent with each other. Caudill testified she had once observed Randy choke Hostler. Caudill testified that she had had a video call with her mother between 9:00 a.m. and 10:00 a.m. the day of Hostler's death; Randy was at the Rider residence during that call, and Valerie indicated that Hostler and Randy had been fighting. Caudill testified that she had initiated another video call between herself, her mother, and her brother David at approximately 10:30 a.m. During that call, Valerie was at the kitchen sink doing dishes, and Valerie stated that Randy had left the home. Caudill testified that her mom had been acting normally and that she observed her dad in the living room with Randy's child.

{¶ 24} Rodney Jr. also testified that Randy was hostile and violent and that Hostler and Randy were constantly fighting with one another. Rodney Jr. testified he had pulled Randy off of Hostler many times in the past; the last time he had done so, he had put a gun to Randy's head because he thought Randy would kill Hostler. Rodney testified that he had informed the police that Randy had not been around the residence for some time prior to the day of Hostler's death. He also testified that after he came home from work that day, his mother informed him that Randy had been there and that Hostler and Randy had fought. Rodney Jr. testified that Valerie had told him that Randy left the home and that, sometime later, Hostler left with a friend. Rodney testified that his parents had left

the house that evening after his mother told him they were going out to scout hunting spots.

{¶ 25} Valerie also testified in her defense. According to her testimony, she and the child woke up at 7:00 a.m. on September 30, at which time she noted that Hostler was in the living room. Valerie said she and the child remained in bed until approximately 9:00 a.m.[3] At that point, she went to the kitchen to get the child a bottle. Valerie testified that Randy then came into the residence, and Hostler asked him where he had been for the past few days. Valerie took the bottle back to her bedroom, closed the door, and initiated a video call to her daughter. Valerie told her daughter that Hostler had learned that Randy's girlfriend was pregnant.

{¶ 26} During the call, the child got out of bed, opened the bedroom door, and ran to Hostler's bedroom. The child went into Hostler's room and the door shut behind her. The child then began to yell that she wanted to come out. Valerie testified that she told Randy to let the child out. When Randy went to the room, the child ran back to Valerie's bedroom. Valerie testified that Randy and Hostler began arguing and that Valerie again closed the door to her bedroom. Valerie continued to speak to Caudill for a few more minutes.

{¶ 27} Valerie testified that she heard Randy walk by her bedroom door toward the kitchen. The child then opened the door and followed Randy to the living room. Valerie testified that Rodney Sr. went to the bathroom and that she went to Hostler's bedroom. Valerie spoke to Hostler and told her that she was welcome to stay in the residence even

---

[3] The evidence in the record indicates that the child slept in a bed located in the bedroom of Randy's parents.

though she knew Hostler had already secured an apartment. Hostler texted someone and then yelled at Valerie. Valerie stated that Hostler then hit her on the side of her head, at which point Valerie pushed Hostler and left the room.

{¶ 28} Valerie testified she went to the living room; she told Randy that Hostler was "pissed" and that Hostler had hit her. Tr. p. 642. She testified that Randy returned to Hostler's bedroom and the two began arguing. At that point, Rodney Sr. entered the living room and Valerie, Rodney, and the child watched cartoons for about 10 minutes; then the arguing stopped and Randy returned to the living room. Valerie testified that she told Randy to leave; Randy gathered his keys and wallet, kissed the child, and left the home at 10:35 a.m. Valerie testified that Randy had been agitated and she thought he was "high." Tr. 647.

{¶ 29} According to Valerie, when Randy left, she told her husband that she was going to talk to Hostler. However, Rodney Sr. told her to let Hostler calm down. Valerie remained in the living room for another 20 minutes and then went to wash dishes. While she was washing the dishes, David and Caudill called her, and the video call lasted at least 45 minutes. When she finished the call, she went to Hostler's bedroom. Valerie knocked on the door but heard no response. She then opened the door and observed Hostler lying face down on the bed with her head at the bottom of the bed. Valerie indicated that Hostler was laying on a white sheet which had been pulled up behind her neck. Hostler's body was cool and stiff.

{¶ 30} Valerie testified that she went to get her husband, who fell to the floor crying when he observed Hostler. Valerie testified that she knew Randy had killed Hostler, but

she did not want her child to go to jail. According to Valerie, she, therefore, lied to her husband and told him that she and Hostler "had gotten into a fight" and that she "thought" she had strangled Hostler. Tr. p. 658. Valerie told her husband that they needed to hide the body, but he indicated that he did not think he could. Valerie told him she would take care of it.

{¶ 31} Valerie testified that she gathered the trash bags and the duffel bag. She then pulled a large black plastic bag over Hostler's feet and up her body. The bag was not big enough, so she placed the white bag over Hostler's head and pulled it downward. Valerie testified that, as she was moving the body toward the duffel bag, the white bag would not stay in place. Therefore, she used duct tape, which she found in Hostler's room, to stick the bag to Hostler's shirt. Valerie testified she got the body into the duffel bag and that she dragged the bag through the house to the back door. She told her husband to move the truck to the back door. She pulled the bag out to the truck, picked it up, and placed it in the truck bed. She then told her husband to move the truck back to the front of the house. Valerie testified that Rodney Jr. came home from work and she fixed him a sandwich. Afterward, she and her husband left with the child to find a place to deposit the body. Valerie testified that when they found a place to dump the body, she told her husband to stay in the truck. She then opened the tailgate, opened the duffel bag, pulled the body out of the plastic bags, and pulled the body down the hill.

{¶ 32} Valerie admitted that she had initially told Deputies Culler and Fischer that Hostler had left the home in a red car. She then was interviewed by a detective to whom she told the same story. She also admitted that she initially told Dep. Holmes that Hostler

had left the home of her own accord. Valerie admitted that after Holmes confronted her with her husband's confession and the fact that Hostler's body had been recovered, she admitted she had strangled Hostler. She testified that she later decided to accurately assert that Randy had committed the killing, because she did not want to go to jail for something she did not do and because she could not "do that to my other kids." Tr. p. 667.

{¶ 33} On cross-examination, Valerie testified that she put the bags over Hostler's body because she knew, from past experience working in a nursing home, that "fluid usually comes out" of dead bodies. Tr. p. 691. However, she admitted there had been no blood or fluid on the bedding. The prosecutor then asked Valerie why no blood was found on the bed sheets despite the fact that Hostler's head had had bloody lacerations. Valerie stated that she could not explain how this had occurred. Valerie also admitted that she had had Hostler's cell phone with her during the search for a dump site and that she had purposefully left her own phone at home. She admitted that when she and Rodney Sr. were in Clark County, she had sent a message from Hostler's phone to her own phone.

{¶ 34} At the end of the trial, the jury found Rider guilty of all charged counts except the charge of aggravated murder.[4] The trial court sentenced Rider to an aggregate prison term of 21 years to life. Rider appeals.

---

[4] The trial court instructed the jury on the offense of murder as a lesser included offense of aggravated murder, because the court believed that the jury could have found that Valerie had not acted with prior calculation. The jury convicted Valerie on the lesser offense.

## II.     Jury Instructions

**{¶ 35}** The first assignment of error states as follows:

THE COURT ERRED IN FAILING TO INSTRUCT THE JURY ON

INFERIOR DEGREE OFFENSES

**{¶ 36}** Valerie asserts that the trial court erred when it failed to give an instruction on aggravated assault as an inferior-degree offense of felonious assault.   She also asserts that the court erred by failing to give an instruction on voluntary manslaughter as an inferior-degree offense of felony murder.   Finally, she contends that the jury should have been instructed on involuntary manslaughter, with aggravated assault as the predicate offense.

**{¶ 37}** As a preliminary matter, we note that Valerie has waived all but plain error regarding the trial court's failure to instruct the jury on additional offenses, because she neither requested the instructions nor objected to their omission.   *See* Crim.R. 30(A). Plain error exists when "but for the error, the outcome of the trial clearly would have been otherwise."   *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus.   "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice."   *Id.* at paragraph three of the syllabus.

**{¶ 38}** Even so, criminal defendants have the "right to expect that the trial court will give complete jury instructions on all issues raised by the evidence."   *State v. Williford*, 49 Ohio St.3d 247, 251, 551 N.E.2d 1279 (1990).   In deciding whether to provide a lesser-included or inferior-offense instruction, the court must find "sufficient evidence" to

allow a jury to reasonably reject the greater offense and find the defendant guilty on a lesser-included or inferior-degree offense. *State v. Ferrell*, 2020-Ohio-6879, 165 N.E.3d 743, ¶ 35 (10th Dist.). When the evidence presented at trial going to a lesser-included offense or inferior-degree offense meets this test, the trial judge must instruct the jury on the lesser-included or inferior-degree offense. *State v. Conley*, 2015-Ohio-2553, 43 N.E.3d 775, ¶ 32 (2d Dist.).

{¶ 39} We begin with the trial court's failure to give an instruction on aggravated assault. This court has recognized that aggravated assault is an inferior-degree offense to felonious assault "as it contains elements which are identical to the elements defining felonious assault, except for the additional mitigating element of serious provocation." *Id.*

{¶ 40} Likewise, voluntary manslaughter is an offense of an inferior degree to murder because it contains the same elements of murder and the additional element of provocation. *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 80, citing *State v. Benge*, 75 Ohio St.3d 136, 140, 661 N.E.2d 1019 (1996).

{¶ 41} Finally, involuntary manslaughter is a lesser-included offense of felony murder. *State v. Thomas*, 40 Ohio St.3d 213, 215, 533 N.E.2d 286 (1988). Involuntary manslaughter under R.C. 2903.04(A), which states "no person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony," is almost identically worded as the felony murder statute but expands the definition to include any felony offense, instead of limiting the predicate crime to a first- or second-degree felony offense of violence. Thus, if the jury found Valerie guilty of

aggravated assault, rather than felonious assault, it would necessarily be limited to a conviction for involuntary manslaughter.

**{¶ 42}** Valerie argues that the record is replete with evidence that she acted under the influence of sudden passion or fit of rage due to serious provocation by Hostler.

**{¶ 43}** "Provocation, to be serious, must be reasonably sufficient to bring on extreme stress and the provocation must be reasonably sufficient to incite or to arouse the defendant into using deadly force." *State v. Deem*, 40 Ohio St.3d 205, 206, 533 N.E.2d 294 (1988), paragraph five of the syllabus. In determining whether the provocation was reasonably sufficient to incite a defendant into using deadly force, the following two-part test is utilized:

> First, an objective standard must be applied to determine whether the alleged provocation is reasonably sufficient to bring on a sudden passion or fit of rage. That is, the provocation must be "sufficient to arouse the passions of an ordinary person beyond the power of his or her control." If this objective standard is met, the inquiry shifts to a subjective standard, to determine whether the defendant in the particular case "actually was under the influence of sudden passion or in a sudden fit of rage." * * * [Additionally,] words alone will not constitute reasonably sufficient provocation to incite the use of deadly force in most situations.

*State v. Mack*, 82 Ohio St.3d 198, 201, 694 N.E.2d 1328 (1998), quoting *State v. Shane*, 63 Ohio St.3d 630, 590 N.E.2d 272 (1992), paragraph two of syllabus.

**{¶ 44}** Valerie notes that she and her husband had been the primary caregivers

for their grandchild, who had lived with them her entire life. In her confession to Dep. Holmes, Valerie claimed that Hostler had threatened not only to take the child away but to prevent the Riders from having contact with the child. Valerie also claimed, both in her trial testimony and her confession to Holmes, that Hostler had screamed at her and then hit her. Finally, Valerie claims she was scared Hostler would place the child in the home of Hostler's mother, who she claimed lived with a known child abuser.

{¶ 45} We first note that Valerie's own testimony demonstrated that she was aware of Hostler's plan to move out of the Riders' residence into an apartment she had recently rented. There was no evidence that Hostler intended to leave the child with the Riders when she moved or that she intended to place the child in her mother's home. Thus, the only evidence of provocation presented by Valerie was her claims that Hostler (1) stated Valerie would not see the child again, and (2) hit Valerie.

{¶ 46} This court has held that "[m]ere verbal exchanges are insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or a sudden fit of rage." *State v. Henry*, 2d Dist. Montgomery No. 22510, 2009-Ohio-2068, ¶ 22, citing *State v. Mack*, 82 Ohio St.3d 198, 694 N.E.2d 1328 (1998). Further, "[c]ases have recognized that a mere push or punch by the victim does not constitute sufficient provocation to warrant an aggravated assault instruction." *State v. Balis*, 8th Dist. Cuyahoga No. 101520, 2015-Ohio-1296, ¶ 14; *Henry* at ¶ 23.

{¶ 47} Here, by Valerie's own admission to the police, after Hostler threatened her and hit Valerie, Hostler started to walk away from her. At that point, Valerie grabbed Hostler from the back and placed her arm around Hostler's neck. As a result of Valerie's

actions, Hostler suffocated.   She also suffered a bruise to her eye and two separate blunt-force lacerations to the back of her head.   From the evidence presented, the jury could have reasonably inferred that Valerie had choked Hostler until she was unconscious and that she then taped the bag over Hostler's head before hitting her on the back of the head.   Hostler's death and injuries were clearly excessive and out of all proportion to the relatively slight amount of provocation present even if Valerie's account were believed.

{¶ 48} On this record, we cannot find that the evidence supported instructions on inferior or lesser-degree offenses.   Thus, the trial court did not err in failing to so instruct. Furthermore, as discussed below, it is clear that Valerie's defense was based upon a claim of actual innocence as to the murder and assault charges.   During both opening statement and closing argument, defense counsel pursued the theory that Randy had actually killed Hostler and that Valerie had only claimed to have killed Hostler in order to prevent her son from going to jail.   Therefore, defense counsel did not request instructions on lesser-included or inferior-degree offenses related to the murder and assault charges.   During discussions with counsel regarding the jury instructions, the trial court noted that such instructions were not appropriate given the nature of Valerie's defense theory.   Defense counsel agreed with the trial court's assessment.

{¶ 49} This court has stated that, in conducting a plain error review, we may take into consideration "a criminal defendant's strategic decision not to seek an instruction on a lesser-included offense, in the hope of winning an outright acquittal."   *State v. Coots*, 2015-Ohio-126, 27 N.E.3d 47, ¶ 87 (2d Dist.) (Fain, J., concurring); *State v. Pullen*, 2d Dist. Montgomery No. 25829, 2015-Ohio-552, ¶ 24.   In other words, "a defendant's

decision not to seek an instruction on a lesser-included offense may inform the calculation whether notice of plain error is necessary to correct manifest injustice." *Coots* at ¶ 87.

**{¶ 50}** Rider's first assignment of error is overruled.

### III.    Sufficiency and Manifest Weight

Rider's second and third assignments of error are as follows:

APPELLANT'S CONVICTION WAS BASED ON INSUFFICIENT EVIDENCE AS A MATTER OF LAW

APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE

**{¶ 51}** Valerie asserts that the record does not support the convictions for felony murder and felonious assault; she argues that the evidence demonstrated that Randy killed Hostler and that Valerie, "in an act of love, chose to protect her son" by claiming responsibility for Hostler's death.

**{¶ 52}** "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). In such situations, we apply the test from *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), which states:

An appellate court's function when reviewing the sufficiency of the evidence

to support a criminal conviction is to examine the evidence admitted at trial

to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

(Citation omitted.) *Id.* at paragraph two of the syllabus.

{¶ 53} In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12. In this situation, a " 'court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2d Dist. Greene Nos. 2013-CA-61 and 2013-CA-62, 2014-Ohio-3432, ¶ 24, citing *Wilson* at ¶ 14.

{¶ 54} "Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a

finding of sufficiency." (Citations omitted.) *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11. *Accord State v. Winbush*, 2017-Ohio-696, 85 N.E.3d 501, ¶ 58 (2d Dist.). As a result, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." (Citations omitted.) *State v. Braxton*, 10th Dist. Franklin No. 04AP-725, 2005-Ohio-2198, ¶ 15.

{¶ 55} Importantly, "[b]ecause the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997).

{¶ 56} Valerie was convicted of felonious assault, a felony of the second degree, in violation of R.C. 2903.11(A)(1). That statute proscribes knowingly causing serious physical harm to another. She was also convicted of felony murder in violation of R.C. 2903.02(B), which states: "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *." "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is

established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact." R.C. 2901.22(B).

{¶ 57} Valerie initially told the police that Hostler had left the home of her own accord. However, after being confronted with the recovery of Hostler's body and her husband's statements to the police, Valerie admitted to the killing. During her confession, Valerie gave the police a detailed description of her actions in strangling Hostler, which corresponded to the mechanism of death described by Goolsby. Valerie even described the noise Hostler made as she was strangled. Additionally, Rodney Sr. testified that Hostler was alive when Randy left the residence and that Valerie had told him she had an altercation with Hostler, after which Rodney observed her dragging the body through the home. Also, Randy testified that he heard his mother and Hostler yelling at each other just before his father told him to leave the residence.

{¶ 58} The jury, as the fact-finder, "is free to believe all, some, or none of the testimony of each witness appearing before it." *State v. Ellis*, 8th Dist. Cuyahoga No. 98538, 2013-Ohio-1184, ¶ 18. Thus, despite Valerie's trial testimony, the jury was free to credit to the testimony of other witnesses.

{¶ 59} Having reviewed of the record, we cannot find that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. There was sufficient evidence presented to demonstrate that Valerie had strangled Hostler. Valerie described committing acts which a reasonable person knows, or should know, can result in serious physical harm, including death. The jury was free

to disregard her trial claim that she was merely covering for her son.

{¶ 60} The second and third assignments of error are overruled.

## IV. Counsel's Representation

{¶ 61} Valerie's fourth assignment of error states:

THE APPELLANT WAS SUBJECT TO THE INEFFECTIVE ASSISTANCE

OF COUNSEL DEPRIVING HER OF A FAIR TRIAL

{¶ 62} Valerie argues that defense counsel rendered ineffective assistance of counsel by failing to: (1) request jury instructions on the inferior offenses of manslaughter and aggravated assault; (2) seek a hearing on the mental competency of Rodney Sr. prior to permitting him to testify; and (3) conduct an effective voir dire and exercise appropriate peremptory challenges. She also argues that defense counsel improperly advised her to waive spousal privilege and permitted her husband to testify.

{¶ 63} To establish ineffective assistance of counsel, a defendant must demonstrate both that trial counsel's conduct fell below an objective standard of reasonableness and that the errors were serious enough to create a reasonable probability that, but for the errors, the outcome of the case would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 141-142, 538 N.E.2d 373 (1989). Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis for a finding of ineffective assistance of counsel. *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605

N.E.2d 70 (1992); *State v. Fields*, 2017-Ohio-400, 84 N.E.3d 193, ¶ 38 (2d Dist.). "The test for a claim of ineffective assistance of counsel is not whether counsel pursued every possible defense; the test is whether the defense chosen was objectively reasonable." *Conley*, 2015-Ohio-2553, 43 N.E.3d 775, ¶ 56. Also, trial counsel is entitled to a strong presumption that his or her conduct fell within the wide range of reasonable assistance. *Strickland* at 689. The reviewing court's focus is not simply on "whether an isolated instance of counsel's performance fell below the standard of professionally acceptable conduct," but on "whether [the] defendant had access to a fair trial." *State v. Malone*, 2d Dist. Montgomery No. 10564, 1989 WL 150798, *3 (Dec. 13, 1989).

{¶ 64} We turn first to the claim that defense counsel was ineffective because he did not seek jury instructions on the inferior offenses of manslaughter and aggravated assault. It is clear from the transcript that Valerie's defense was based upon a claim of actual innocence to the felony murder and felony assault charges. During both opening statement and closing argument, defense counsel vigorously pursued the theory that Randy had actually killed Hostler and that Valerie had only claimed to have killed her in order to prevent her son from going to prison. Defense counsel also presented the testimony of Randy's brothers, sister, and best friend to establish that Randy was violent and had anger issues and that Randy had assaulted Hostler many times in the past. Additionally, Valerie testified that Randy was the killer and that she had merely attempted to protect him.

{¶ 65} In Ohio, it is presumed that the failure by defense counsel to request jury instructions on lesser-included or inferior-degree offenses is a matter of trial strategy and

does not establish ineffective assistance of counsel. *State v. Griffie*, 74 Ohio St.3d 332, 333, 658 N.E.2d 764 (1996); *State v. Wilson*, 182 Ohio App.3d 171, 2009-Ohio-1681, 912 N.E.2d 133, ¶ 421 (8th Dist.). *See also State v. Lewis*, 8th Dist. Cuyahoga No. 108463, 2020-Ohio-5265, ¶ 51, quoting *State v. Jackson*, 6th Dist. Sandusky No. S-15-020, 2016-Ohio-3278, ¶ 20 ("[T]here is a presumption in Ohio that the failure to request an instruction on a lesser-included offense constitutes a reasonable 'all or nothing' trial strategy."); *State v. Viers*, 7th Dist. Jefferson No. 01JE19, 2003-Ohio-3483, ¶ 47 ("[C]ourts tend to overrule [ineffective assistance] arguments based upon our deference to the all-or-nothing trial strategy."); *State v. Vogt*, 4th Dist. Washington No. 17CA17, 2018-Ohio-4457, ¶ 119 (finding it would have been inconsistent to argue for complete acquittal while at the same time arguing for the lesser-included offense).

**{¶ 66}** Here, the record does not disclose a specifically stated reason for counsel's failure to seek jury instructions on the lesser-included or inferior-degree offenses. However, because counsel orally agreed with the trial court's statement that such instructions were not applicable to the defense theory of actual innocence, "we will presume that counsel was motivated by trial strategy and did not render ineffective assistance of counsel." *Conley*, 2015-Ohio-2553, 43 N.E.3d 775, ¶ 63. Thus, we conclude Valerie has failed to demonstrate counsel was ineffective in this respect.

**{¶ 67}** We next address Valerie's assertion that Rodney Sr. was not competent to testify at trial and that defense counsel was ineffective for failing to seek a hearing on his mental competency.

**{¶ 68}** R.C. 2317.01 provides that "[a]ll persons are competent witnesses except

those of unsound mind and children under ten years of age who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly." *Accord* Evid.R. 601(A). The term "unsound mind" is defined in R.C. 1.02(C) to "include all forms of derangement or intellectual disability." "Although not defined in the Revised Code, 'derangement' has been equated with insanity." *Fisher v. Ohio Univ.*, 63 Ohio St.3d 484, 488, 589 N.E.2d 13 (1992), citing *Webster's Third New International Dictionary* 607 (1986). "Insanity" is defined in *Black's Law Dictionary* 810 (8th Ed.2004), as "[a]ny mental disorder severe enough that it prevents a person from having legal capacity and excuses the person from criminal or civil responsibility. Insanity is a legal, not a medical, standard."

{¶ 69} Valerie asserts that her husband's incompetency was evidenced by his inability to recall specific events during his testimony. She further asserts that her husband "[a]llegedly has Parkinson's disease and experiences hallucinations."

{¶ 70} There is no evidence in the record to establish that defense counsel had any reason to believe Rodney Sr.'s competency was an issue. Indeed, there is no competent evidence in the record to support the conclusion that Rodney Sr. was of unsound mind. Thus, we conclude that Valerie's claim that counsel was ineffective for failing to seek a competency hearing lacks merit.

{¶ 71} We next examine Valerie's assertion that defense counsel failed to conduct a meaningful voir dire and failed to properly exercise challenges to certain jurors. Although she mentions numerous jurors in her argument, Valerie specifically challenges the empanelment of Jurors 14, 73 and 88. Juror 14 stated that his brother had previously

been prosecuted by the same prosecutor as in this case. Juror 73 indicated that the prosecutor had represented his stepson in a civil matter approximately 10 to 12 years earlier. Juror 88 indicated that the prosecutor had handled a civil case for her and that she was good friends with defense counsel's wife.

{¶ 72} "Few decisions at trial are as subjective or prone to individual attorney strategy as juror voir dire, where decisions are often made on the basis of intangible factors." *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 64, quoting *Miller v. Francis*, 269 F.3d 609, 620 (6th Cir.2001). Further, "[t]he selection of a jury is inevitably a call upon experience and intuition. The trial lawyer must draw upon his own insights and empathetic abilities. Written records give us only shadows for measuring the quality of such efforts. * * * [T]he selection process is more an art than a science, and more about people than about rules." *Id; see also Romero v. Lynaugh*, 884 F.2d 871, 878 (5th Cir.1989). "In some cases, asking few or no questions of a prospective juror 'may be the best tactic for a number of reasons. For example, questioning by other parties may convince counsel that the juror would be favorable for the defense, and that further questions might only antagonize the juror or give the prosecution a reason to use a peremptory challenge or even grounds for a challenge for cause.' " *Mundt* at ¶ 65, quoting *People v. Freeman*, 8 Cal.4th 450, 485, 34 Cal.Rptr.2d 558, 882 P.2d 249 (1994). "For these reasons, we have recognized that 'counsel is in the best position to determine whether any potential juror should be questioned and to what extent.' " *Id.* at ¶ 64, quoting *State v. Murphy*, 91 Ohio St.3d 516, 539, 747 N.E.2d 765 (2001).

{¶ 73} We have reviewed the record and cannot find that counsel's questions or decisions regarding the above-cited jurors were deficient. The record shows the jurors were asked about their ability to be fair and impartial and all three affirmed that they would be fair and impartial. We find no reason to question their affirmations.

{¶ 74} Finally, we examine Valerie's claim that trial counsel was ineffective because he advised her to waive spousal privilege and permit her husband to testify at trial.

{¶ 75} Valerie's argument addresses spousal privilege and spousal competency, which are two distinct but related legal concepts. For spousal testimony to be admissible, it must be competent under Evid.R. 601(B) and it must not be privileged under R.C. 2945.42. In this case, the trial court correctly determined that Rodney Sr. was aware that he had the right to make an election whether to testify against his wife and that he chose to so testify. Thus, the record demonstrates he was competent to testify against Valerie. *See State v. Adamson*, 72 Ohio St.3d 431, 433-434, 650 N.E.2d 875 (1995).

{¶ 76} The second legal concept, spousal privilege in criminal cases, is governed by R.C. 2945.42, which states, in pertinent part:

* * * Husband or wife shall not testify concerning a communication made by one to the other, or act done by either in the presence of the other, during coverture, unless the communication was made or act done in the known presence or hearing of a third person competent to be a witness, * * *. The presence or whereabouts of the husband or wife is not an act under this

section.   * * *

**{¶ 77}** "R.C. 2945.42 confers a substantive right upon the accused to exclude privileged spousal testimony concerning a confidential communication made or act done during coverture unless a third person was present or one of the other specifically enumerated exceptions contained in the statute is applicable." *State v. Rahman*, 23 Ohio St.3d 146, 149, 492 N.E.2d 401 (1986).   The right to the privilege belongs to the non-testifying spouse.   *State v. Savage*, 30 Ohio St.3d 1, 2, 506 N.E.2d 196 (1987). However, such "[p]rivileges are to be construed narrowly because they impede the search for truth and contravene the principle that the public has a right to everyone's evidence." *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 121.   The statute specifies that a "[h]usband or wife shall not *testify* concerning a communication made by one to the other * * *." (Emphasis sic.)   *Id.*   "Thus, on its face, the statute does no more than preclude a spouse from testifying to the other spouse's statements."   *Id.* at ¶ 113.   It does not preclude the admission of such evidence via other means.   *Id.* at ¶ 120.   Indeed, the Ohio Supreme Court has held that a spouses' disclosures to investigating police officers regarding privileged acts or communications may be introduced at trial.   *See State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948.

**{¶ 78}** The record discloses that both Valerie and her husband, Rodney Sr., were interviewed by the police.   It was only after Valerie was confronted with statements made by her husband and the discovery of Hostler's body that Valerie confessed that she had strangled Hostler.   Thus, it can be inferred that Rodney Sr. informed the police of

statements made to him by Valerie and that those statements could have come into the record without Rodney Sr.'s testimony. Further, defense counsel may have determined that the information to which Rodney Sr. testified was admissible via yet another source. Thus, we cannot say that counsel was ineffective for advising Valerie to waive the privilege. Indeed, counsel may have had a strategic purpose in presenting the testimony through Rodney. In any event, on this record, we have no basis to conclude that the decision constituted ineffective assistance of counsel.

{¶ 79} "[T]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). On this record, we cannot say that counsel's conduct fell below an objectively reasonable standard.

{¶ 80} The fourth assignment of error is overruled.


## V. Conclusion

{¶ 81} All of Valerie's assignments of error being overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . .


WELBAUM, J. and LEWIS, J., concur.


Copies sent to:

Jane A. Napier
L. Patrick Mulligan
Frank Matthew Batz
Laura M. Woodruff
Hon. Nick A. Selvaggio