[Cite as *State v. Newby*, 2024-Ohio-1391.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 2023-CA-30 |
| | : | |
| v. | : | Trial Court Case No. 23-CR-109(B) |
| | : | |
| KITANA NEWBY | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on April 12, 2024

. . . . . . . . . . .

REGINA R. RICHARDS, Attorney for Appellant

ROBERT C. LOGSDON, Attorney for Appellee

. . . . . . . . . . . .

HUFFMAN, J.

{¶ 1} Kitana Newby appeals from her conviction on one count of complicity to attempted murder, with a firearm specification. For the reasons that follow, the judgment of the trial court is affirmed.

**Procedural History**

**{¶ 2}** Newby and her co-defendant, Jeffrey Dyer, were indicted on February 22, 2023. Newby was indicted for complicity to attempted murder and complicity to felonious assault, with a firearm specification as to each offense; Dyer was indicted for attempted murder and felonious assault, with firearm specifications. The events giving rise to the indictments occurred on January 29, 2022, when Newby and Dyer got into an altercation with Jason Ware. Newby and Dyer were traveling together in a Honda Accord driven by Newby, and Ware was driving alone in his truck; their altercation began at a stop light and culminated at a Speedway gas station in Springfield, where Dyer shot Ware in the neck.

**{¶ 3}** Newby pled not guilty to the charges on March 9, 2023. She and Dyer were tried together by a jury in June 2023. Newby and Dyer were represented jointly by retained counsel, and they executed waivers of potential conflicts of interest due to the dual representation.

**{¶ 4}** At the conclusion of the State's case, defense counsel moved for a judgment of acquittal as to Newby on both counts and a judgment of acquittal as to Dyer for attempted murder. The court overruled the motions. The court provided a self-defense jury instruction as to Dyer only. The jury rendered guilty verdicts on all counts. In Newby's case, the trial court merged the offenses and sentenced Newby to an indefinite term of four to six years for complicity to attempted murder, plus three years on the firearm specification.

**{¶ 5}** Newby appeals, raising four assignments of error. In December 2023, she filed a brief that exceeded the page limits set forth in Loc. App.R. 2.2. On March 18, 2024, after the State filed its brief, Newby filed a motion for leave to file a brief in excess

of the page limit (referencing her December brief) and to reform the table of contents. That motion is granted.

**Evidence Presented at Trial**

{¶ 6} For ease of analysis, we will begin by reviewing the evidence presented through the testimony of multiple witnesses at trial. Surveillance videos from the Speedway and a nearby McDonald's were also admitted into evidence.

*Rebecca Taylor*

{¶ 7} Rebecca Taylor testified that on January 29, 2022, she was parked at the Speedway gas station at the corner of Derr and Villa Roads in Springfield listening to music while her daughters went inside the store. Taylor observed Newby's car and Ware's truck parked by the pumps, and she was aware of an argument, although she could not hear what was being said. She observed Ware pull his truck forward near the Villa Road entrance, stop, and get out of the truck; Newby also exited her vehicle. Taylor also observed Dyer exit Newby's car, grab Newby around the waist, and turn her around. According to Taylor, Newby went back to her car, Ware turned toward his truck, and Dyer reached into his white hoodie pocket, pulled out a gun, and shot Ware four or five feet from the back of his truck. At the time, the "bickering was still going on," but Taylor thought the incident was over. She did not observe any actions or threats from Ware, and she described Newby as "more loud and boisterous" than the others. She testified that Ware was dressed in dark clothing.

*Melissa Mitchem*

{¶ 8} The same evening, Melissa Mitchem, a home health nurse, was in the parking lot at Rose's Discount Store near Speedway. She heard arguing and yelling, and she "knew it wasn't gonna be good by the tone." Mitchem could not make out what was being said, and she then heard a gunshot. She observed Ware fall toward the back end of his truck, which was near an exit from the Speedway parking lot and not in a parking space; Ware fell "like a noodle." Mitchem saw "figures in a car" about 20 feet from Ware but did not see who had shot him. Mitchem's husband drove her over to Ware, and she held pressure on his neck until medics arrived.

*Raven Anderson*

{¶ 9} Raven Anderson testified that she was working inside the Speedway on the night of the shooting. While waiting on customers, she heard arguing in the "pump lot" that went on for a couple of minutes. Anderson went to a window to see what was happening. She observed interaction between three people, one of whom was on the side of the pump near Anderson and two of whom were on the other side of the pump; Anderson assumed it was a "road rage" incident. As she prepared to call 911, the door to the parking lot opened, and Anderson heard someone say, "I am going to shoot." She stated that it was "definitely a female's voice." After hearing the gunshot, Anderson called 911.

{¶ 10} Surveillance video from the Speedway was played during Anderson's testimony; she identified Newby's vehicle circling around to park at Pump 5 and Ware's truck stopped at Pump 6 on the opposite side of Pump 5. She stated that, when Ware started to leave, Newby and Dyer started to follow his truck. According to Anderson,

when Ware started to drive away, "the people started walking towards the [truck] like they were going to try to continue the confrontation." Anderson did not see anything else until she heard the gunshot. She identified Ware as wearing a dark blue or black coat at the scene and Dyer as wearing a white hoody.

{¶ 11} On cross-examination, Anderson testified that the surveillance video depicted Newby's vehicle approaching the pump "at a reasonable pace," whereas Ware had entered the Speedway "very fast," but she had not actually observed their arrival. On redirect, Anderson read the written statement she gave to police the night of the incident, over objection. It said:

> I heard an argument going on in my parking lot next to Pump 5 and Pump 6. A man and woman were yelling at a man in truck. The man in the truck went to drive away, but the female kept yelling and said she would shoot him. The man in the truck stopped his truck and got out and started to yell back at her and the man. The man and the woman walked towards the man and started to scream and shout. When I walked to the doors, we heard a pop. The man and woman got in the car, a gold Honda Accord, heading north on Derr Road. The man was white, black hair, wearing a white shirt. The * * * female * * * was light skinned to black with a red head wrap. The female was yelling about the man in the truck being on her car and damages being done.

*John Eldridge*

{¶ 12} John Eldridge testified that he was at the Speedway on the night of the

shooting, and he observed a truck sitting not quite at the exit to the station in "an odd spot." After exiting his vehicle, Eldridge heard "a bunch of arguing" and a gunshot, and then he observed a "young man" walking briskly from the oddly-parked truck to a gold Honda Accord that was on the "outside pump." As he walked, the man put a pistol into his pocket. The man with the gun was wearing a white T-shirt and tan pants. Eldridge also observed a woman between the truck and the Honda "still rattling on about something" in an angry and aggressive manner.

*Damian Gibson*

{¶ 13} Damian Gibson was at the Speedway on the night of the shooting, and he heard arguing from inside his vehicle. Gibson testified that the arguing escalated, and he saw a man pull up in his truck "very fast," slam on his brakes, and get out of the truck. Gibson observed people later identified as Dyer and Newby approach the man from the truck, but the woman (Newby) was the only one he heard yelling and arguing with the guy in the truck. According to Gibson, the woman's boyfriend was trying to bring her back to a gold Honda Accord. At one point, Newby and the man from the truck were "close enough to be face to face" but not close enough to touch each other. Gibson did not hear anything from Dyer, and he saw the man from the truck "flinch" at Newby, but there was no touching, fighting, or hitting   Gibson then heard a gunshot and saw Ware instantly fall; the other man and woman ran back to their car and left. According to Gibson, Ware had walked less than six feet from the bed of his truck before he was shot; Dyer was behind Newby the entire time, trying to bring her back to the car, but "[i]t didn't work."

{¶ 14} When asked about the "flinch" on cross-examination, Gibson stated that the

man from the truck may have "just jerked a little bit" but did not lunge at anyone. Gibson reiterated that the victim had been arguing with the woman from the car, but there had been "no threats or anything," and Gibson did not believe the "flinch" by Ware had been an "aggressive approach."

### Brooklyn Miller

{¶ 15} Brooklyn Miller was at the Speedway on the night of the shooting with her boyfriend, Damian Gibson. While in Gibson's vehicle, she observed Ware in his truck arguing with Newby, who was standing outside her vehicle, while Dyer remained quiet. She heard the words "shooting" or "shoot you" in a female voice. According to Miller, Ware got out of his truck and continued to argue, and "there was a little bit of physical flinching towards each other," but nothing touched. Miller stated that the man who had the gun "grabbed his girlfriend," swung her around, and then ran up and shot the man from the truck. According to Miller, Ware "did not go forward or nothing but he was kind of like going to turn around and go back to his truck and then that's when he got shot." Dyer was wearing white and gray, and Newby was wearing something red.

### Officer Beau Ray

{¶ 16} Officer Beau Ray of the Springfield Police Department responded with his partner to the Speedway. Ray observed Ware "laying on the ground on his back" to the rear driver's side of the truck on the north side of the parking lot.

### Officer Allison Craig

{¶ 17} Officer Allison Craig, an evidence technician with the Springfield Police Department, responded to the Speedway after the shooting; when she arrived, Ware had

already been taken from the scene. She placed yellow placards to mark evidence pertinent to the investigation and took photographs of the scene. Using the placards, Craig identified the location of a 9-millimeter spent shell casing and places where blood was found near Ware's truck. She testified that no weapons were found in the truck. Craig testified that she did not measure the distance between the gas pumps and the back of Ware's truck.

*Sergeant James Byron*

{¶ 18} Sergeant James Byron of the Springfield Police Department Investigation Unit, Crimes Against Persons Division, administered two photo arrays of six photos each to Ware on February 7, 2022, at the request of Detective Daniel DeWine. Ware selected a photo of Newby in the first array, stating that she had been wearing red the day of the shooting. In the second array, Ware selected Dyer, stating, "He looks familiar. Something in my heart says that's him." Byron served as a blind administrator; he had no knowledge of the shooting prior to administering the arrays.

*Jason Ware*

{¶ 19} Jason Ware was 38 years old at the time of trial and lived in Springfield. He testified that, on the day of the shooting, he pulled behind the Honda driven by Newby while driving north on Limestone Street at a stoplight at Home Road. Dyer was in the passenger seat of the Honda. The Honda's right turn signal was on, and as Ware pulled behind it, the car "scooted forward," and then Ware also "scooted closer" to the car. He noted that the Honda did not turn until the light turned green. Ware stated that the Honda turned into the outside lane closest to oncoming traffic, and he turned into the inside lane.

While turning, Ware observed Newby "pointing and yelling and giving the finger," which he believed was directed to Dyer. Ware testified that, as he started to speed up, the Honda sped up next to him like "they were trying to keep up" with him. According to Ware, he was a "pretty fast" driver, even through town, and when he noticed the Honda's speed increasing, he "gunned it" to "close to a hundred miles an hour" down Home Road toward the light at Derr Road, until he believed the Honda was no longer behind him.

{¶ 20} Ware got into the left lane on Home Road, then turned into the right-hand lane on Derr Road, because he was planning to make a right-hand turn onto Vester Avenue. Upon reaching Vester Avenue, Ware heard honking and saw the Honda again driving next to him; the woman in the car "was pointing and yelling and giving [him] the bird." According to Ware, he then turned around and followed the car into the Speedway, with no "malicious intent," only to "find out what was going on." When Ware pulled in, the Honda was pulling into the opposite side of the gas pumps. Ware did not get out of his truck, but Dyer got out of the Honda, and Newby "instantly" jumped out the car and was yelling about Ware's "tailing" her. Newby threatened to "whoop [Ware's] ass" and said Ware did not know who he was dealing with. Ware yelled back, saying "you really don't want no problems. I want no problems." When Ware started to drive away, Newby yelled, "I'll f******* kill you."

{¶ 21} Ware then stopped his truck and got out. He walked toward the back of his truck and yelled, "Do you know who I am?" According to Ware, "it wasn't a question of me personally. It was a question of do you know who God is." Ware was on a "spiritual journey" at the time, having just finished writing a book entitled "Finding God

Through Looking into Self"; he said "do you know who I am?" was a rhetorical question. Ware had also been fasting to prepare for Ramadan. Newby replied, "I don't give a f*** who you are," and she spit in Ware's face. According to Ware, Dyer was standing behind Newby, "grabbing her and pulling her back" when she spit in his face. Ware turned around to walk away and, as he did so, he "heard the bang." Ware was walking back to his truck when Dyer shot him on the left side of his neck.

{¶ 22} Ware testified that he had not been carrying any weapons, had made no threats, and "had no ill will about fighting at all." Ware stated that Newby had said she was going to kill him, and he "was waiting to see if it was gonna happen, really. Like, prove it." He estimated that he was two or three feet from the back of his truck when he was shot, and he was next to his truck when he fell. Ware testified that when he had initially pulled his truck forward, he "was almost at the exit," whereas Newby and Dyer were at the pump, "so they literally had to walk up on - - me, ran up on me," and it happened so fast he did not have time to react. Ware did not see Dyer draw a weapon and he did not know which of them shot him. He indicated that Dyer had been wearing a beige or off-white hoodie at the time of the incident. Ware was paralyzed from the chest down as a result of the shooting.

{¶ 23} Ware testified that he had identified Newby and Dyer in the photo arrays, and he identified each of them in court. Ware further identified Newby as the person he had argued with, who had spit in his face, and who had driven the Honda. Ware identified himself and Dyer in the Speedway and McDonald's surveillance videos, as well as the Honda "speeding off" after the shooting.

{¶ 24} On cross-examination, Ware stated that Dyer had been a foot or two from him when he was shot, and Ware himself had been next to his truck. Regarding Newby's location, Ware stated that she had been "two feet in front of me, if that," such that he could have reached out and touched her. Ware testified that he was "turning away as [Dyer] was pulling [Newby] back," and that the gunshot wound had been in the back side of his neck. Ware estimated that, previously, when Ware had been next to the exit and Dyer and Newby had been next to the pump, they had been 30 to 60 feet apart; he testified that when he exited his truck, Dyer and Newby approached him, and he did not make any movement toward them. Ware stated that, if Newby had not approached him, Dyer would not have approached him, because Dyer was following and trying to restrain Newby.

*Detective Daniel DeWine*

{¶ 25} Detective Daniel DeWine, who retired from the Springfield Police Department after 31 years, was the lead detective on Ware's shooting. He testified that a handgun ejects a spent casing to the right side and that, based upon the location of the casing found at the scene, Dyer was close to Ware when the weapon was fired, although DeWine acknowledged that casings may be kicked or moved out of place. DeWine testified that the Speedway surveillance video showed two figures approach the truck and then come back; one was the "young man with the white sweatshirt." In the McDonald's video, DeWine also identified a person in a white sweatshirt who went up toward the truck for "just a second or so" and then walked back over to the car before the car headed north on Derr Road. DeWine testified:

On the video that you can see that he [Ware] first stops, as it was said that there were words from witnesses and him that were exchanged. As he went to pull away, there were more words. He stops, gets out of his truck, walks to the back of the truck, and Ms. Newby approaches him. Then Mr. Dyer comes towards him. He never leaves the area of his truck, and then within seconds, as you can see on the video, within seconds there's a shot fired which disables Mr. Ware.

{¶ 26} DeWine obtained a partial license plate number at the scene and learned that the Honda was associated with Newby. He put the photo arrays together for Sgt. Byron to administer to Ware, and DeWine was not in the room when Byron did so. Newby and Dyer did not contact law enforcement about the incident prior to their indictment. DeWine stated that the distance between the Honda and the truck after Ware pulled forward was "at least 25 feet," and he estimated that the shot was fired from a distance of at least six feet from Ware.

*Jeffrey Dyer*

{¶ 27} Jeffrey Dyer was the only witness to testify for the defense. He was 18 years old on the day of the shooting and in a relationship with Newby. He was in Newby's vehicle on his way to do laundry at his mother's home when he was awakened by Newby's yelling and screaming. He observed Ware "staring down" at them from his truck "with really wide eyes" before Ware sped away. When he and Newby reached Derr Road, they turned left and noticed Dyer's truck ahead of them about to turn onto Vester Avenue. Ware then slammed on his brakes, which almost caused them to hit his truck; Newby and

Dyer "had to swerve into the opposite lane and honked [the] horn to go around him" before pulling into Speedway. Dyer's gun was in the center console of Newby's vehicle.

{¶ 28} Dyer saw Ware turn onto Vester after he "brake checked" them, and Dyer believed that Ware "went on with his business." Based on one of the videos, Dyer stated that when Ware arrived at the Speedway, the initial exchange of words lasted about 30 seconds. According to Dyer, Ware rolled his window down and screamed at them, called them names, asked if they knew who he was, and "kept waving something up." Dyer remained quiet, but Newby called Ware "the B word" as Ware started to speed off, and then Ware slammed on his brakes. Dyer denied that Newby had threatened Ware. Dyer believed that Ware wanted to "start trouble."

{¶ 29} Dyer testified that Ware walked toward him and Newby at Speedway; he denied that they ever approached Ware. According to Dyer, Newby and Ware "met in the middle" area between the Honda and the truck, but Dyer never stepped toward the truck and stayed next to the pumps "almost the whole time." Dyer approached Newby to "deescalate the situation," but she would not come with him: then Dyer stepped back because he was fearful. Newby spit at Ware; Ware walked to his truck, touched the door handle, then "turned around and made a full sprint towards [Dyer] with his hands up in the air." Dyer stated that he fired only one shot at Ware because he was trying to scare Ware away rather than hurt him. Dyer stated that he "shouldn't have done it" but that he was in fear for his life and didn't know what else to do. According to Dyer, he felt that Ware had grabbed something when he went back to his truck, and Ware said "that he had something for me." Dyer testified that Newby did not encourage him to shoot Ware,

did not give him the gun to shoot Ware, and did not drive him to kill Ware.

{¶ 30} With respect to Newby's role, Dyer testified as follows on cross-examination:

Q. If [Newby] wasn't yelling like she was and acting like she was, do you think that you would have shot him?

A. No, sir. I wasn't trying to shoot him in the first place.

Q. * * * Do you think it's fair to say she influenced you or incited you to do what you did?

A. No, sir. She did not influence me.

* * *

Q. And you were in fear for your life when you were back at the car.

A. And he was charging at me, yes.

Q. And he had his hands up, you said, right?

A. He had his hands like this (indicating), waving them crazy.

Q. So you didn't see any guns in his hands, any knives in his hands, right?

A. I didn't know what he had. * * * For all in know, he had a knife and I didn't know. * * *

* * *

Q. She [Newby] wasn't scared of him, right?

A. No, sir.

{¶ 31} Dyer testified that he was wearing a dark gray sweatshirt at the time of the shooting.

{¶ 32} Newby did not testify at trial.

## Trial Counsel's Alleged Ineffectiveness

{¶ 33} As noted above, Newby asserts four assignments of error on appeal. Her first assignment of error is:

APPELLANT WAS DENIED HER RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE I, SECTION 10, OF THE OHIO CONSTITUTION WHERE TRIAL COUNSEL'S CUMULATIVE DEFICIENCIES PREJUDICED HER RIGHT TO A FAIR TRIAL.

{¶ 34} In this lengthy assignment of error, Newby asserts that trial counsel did not obtain her waiver of the conflict inherent in his dual representation of her and Dyer until the day of trial, which was nearly three months after the dual representation began. She contends that "antagonistic defenses were foreseeable" and that she was prejudiced by Dyer's testimony as to acting in self-defense and by counsel's failure to assert self-defense on her behalf. Newby also argues that defense counsel's "improper comments and unprofessional conduct" fell below an objective standard of reasonableness, as evidenced by the trial court's repeated admonishments of counsel in front of the jury, which prejudiced her right to a fair trial.

{¶ 35} The State responds that Newby waived her right to her own counsel "throughout the trial process." According to the State, her written waiver occurred prior to trial and after Newby would have known of defense counsel's filing of a notice of self-

defense on behalf of Dyer only. The State further argues that defense counsel's attempt to frame Dyer's conduct as self-defense could have benefitted Newby, because if Dyer had been found to have acted in self-defense "for the actual shooting of the victim, then [Newby] would have been acquitted by extension" because Dyer also acted in defense of Newby. According to the State, the fact that the jury was unpersuaded by the self-defense argument did not negate it as a reasonable trial strategy and did not mean that trial counsel was ineffective for having chosen that strategy. Finally, the State asserts that the trial court's admonishments of defense counsel "were made during defense counsel's attempt to get evidence helpful to Newby into the record" and that she has not demonstrated prejudice.

{¶ 36} In reply, Newby argues that her "waiver of dual representation" did not waive her right to adequate and effective representation as guaranteed by the Sixth Amendment. She again argues that trial counsel's failure to assert self-defense on her behalf establishes ineffective assistance, because she "had the requisite state of mind to use force to repel Ware for following her and confronting her." She also claims that the surveillance videos were of poor quality and lacked evidentiary value.

{¶ 37} We review alleged instances of ineffective assistance of trial counsel under the two-prong analysis set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by the Supreme Court of Ohio in *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). *See also State v. Blanton*, 2023-Ohio-89, 206 N.E.3d 14, ¶ 56 (2d Dist.). To prevail on a claim of ineffective assistance, Newby must show that trial counsel rendered deficient performance and that counsel's

deficient performance prejudiced her. *Strickland* at paragraph two of the syllabus; *Bradley* at paragraph two of the syllabus. In the absence of a showing of either deficient performance or prejudice, a claim of ineffective assistance of counsel fails. *Blanton* at ¶ 56, citing *Strickland* at 697.

{¶ 38} To establish deficient performance, a defendant must show that trial counsel's performance fell below an objective standard of reasonable representation. *Strickland* at 688. In evaluating counsel's performance, a reviewing court "must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. "The adequacy of counsel's performance must be viewed in light of all of the circumstances surrounding the trial court proceedings." *State v. Jackson*, 2d Dist. Champaign No. 2004-CA-24, 2005-Ohio-6143, ¶ 29, citing *Strickland*.

{¶ 39} To establish prejudice, a defendant must show that there is "a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204, citing *Strickland* at 687-688 and *Bradley* at paragraph two of the syllabus. " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Bradley at* 142, quoting *Strickland* at 694.

{¶ 40} In reviewing ineffective assistance claims, we must not second-guess trial strategy decisions. *State v. Mason*, 82 Ohio St.3d 144, 157, 694 N.E.2d 932 (1998); *Strickland* at 689. Therefore, " 'trial counsel is allowed wide latitude in formulating trial strategy[.]' " *State v. Collins*, 2d Dist. Miami No. 2010-CA-22, 2011-Ohio-4475, ¶ 15, quoting *State v. Olsen*, 2d Dist. Clark No. 2009-CA-110, 2011-Ohio-3420, ¶ 121.

"Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had been available." *State v. Conley*, 2015-Ohio-2553, 43 N.E.3d 775, ¶ 56 (2d Dist.), citing *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992).

### Conflict of Interest

{¶ 41} An element of the constitutional right to counsel is the right of a defendant who does not require appointed counsel to choose who will represent him (or her). *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006). "Defense counsel has a duty to provide effective, conflict free assistance of counsel under the Sixth Amendment and its supporting caselaw * * * and pursuant to the Ohio Rules of Professional Conduct." *State v. Williams*, 166 Ohio St.3d 159, 2021-Ohio-3152, 184 N.E.3d 29, ¶ 6, citing *Cuyler v. Sullivan*, 446 U.S. 335, 345, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). "An attorney representing multiple defendants in criminal proceedings is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop during the course of the trial." *State v. Seals*, 2d Dist. Clark No. 2004-CA-63, 2005-Ohio-4837, ¶ 14, citing *State v. Manross*, 40 Ohio St.3d 180, 532 N.E.2d 735 (1988). "Unless the trial court knows or reasonably should know that a particular conflict of interest exists, or unless the defendant objects to multiple representation, the trial court need not initiate an inquiry into the propriety of such representation." *Id.,* citing *Cuyler* at 347; *Manross* at syllabus.

{¶ 42} "[I]n order to establish a violation of the Sixth Amendment right to effective assistance of counsel, a defendant who fails to object to joint representation at trial must

demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Id.* at ¶ 15, citing *Cuyler* and *Manross*. "The term 'conflict of interest' involves circumstances in which regard for one duty tends to lead to disregard of another duty, such as when there is representation of multiple clients with incompatible interests." *Id.* at ¶ 16, citing *Manross*. "A possible conflict of interest exists where the interests of the defendants *may* diverge at some point, so as to place the attorney under inconsistent duties, but an actual conflict of interest is shown where during the course of the representation the defendants' interests *do* diverge with respect to a material factual or legal issue or to a course of action." (Emphasis sic.) *Id.*, citing *State v. Gillard*, 78 Ohio St.3d 548, 679 N.E.2d 276 (1997). "A lawyer represents conflicting interests when, on behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose." *Id.,* citing *Columbus Bar Assn. v. Grelle*, 14 Ohio St.2d 208, 237 N.E.2d 298 (1968); *Manross.* "In order to demonstrate an actual conflict of interest based upon what an attorney has failed to do, a defendant must demonstrate that [some] plausible alternative defense strategy or tactic that has sufficient substance to be at least viable might have been pursued but was not undertaken due to the attorney's conflicting loyalties or interests." *Id.* at ¶ 16, citing *Gillard*.

**{¶ 43}** "Raising the *possibility* of a conflict of interest is insufficient." *Williams* at ¶ 8, citing *Manross* at 182. In *Manross*, as here, "neither of the codefendants objected to the dual representation, and thus, it was their burden on appeal to demonstrate that an actual conflict existed and that the conflict adversely affected their lawyer's performance." *Id.* at ¶ 11, citing *Manross.* The Ohio Supreme Court found no actual conflict in *Manross*,

which involved mother and son defendants; it found that their respective defenses did not result in one assigning blame to the other and they had a common interest in attacking the credibility of the State's witnesses.   *Manross* at 182.

**{¶ 44}** On the first day of trial, the trial court asked Dyer and Newby individually if defense counsel had discussed a waiver of potential conflict with them.   It addressed Newby as follows:

> THE COURT:   I * * * want to read to you the same waiver that I just read to your Codefendant Mr. Dyer in this matter:   I understand that I have a constitutional right to representation in this matter.   I further understand that if I cannot afford an attorney, an attorney would be appointed to me to represent me in all matters before this Court.
>
> I am aware of potential conflicts of interest that may arise with my attorney also representing my Codefendant at a joint trial.   I believe that my attorney of choice will be able to provide competent and diligent representation to each affected client.   I hereby give consent to my attorney to continue his representation of my Codefendant and myself in all proceedings in this matter.   I have consulted with my attorney and have had adequate time to make this decision.   In no way am I being forced or coerced to make this decision; and I am making this decision knowingly, intelligently, and voluntarily.
>
> Do you understand all that, ma'am?
>
> [NEWBY]:   Yes, Your Honor.

THE COURT: And is it your desire here today to waive any potential conflicts and have [Defense Counsel] represent both you and Mr. Dyer at this trial today?

DEFENDANT NEWBY: Yes, Your Honor.

THE COURT: Again, has she executed that document, [Defense Counsel]?

[DEFENSE COUNSEL]: She has, Your Honor.

THE COURT: I then am going to find that the Defendant has knowingly, intelligently, and voluntarily executed this document and has waived her right to having her own separate counsel at this time.

{¶ 45} Newby and Dyer had jointly retained defense counsel to represent them and expressed no objection to that arrangement as trial began. Defense counsel was in the best position to know of the existence of any conflict. Although Newby questions the timing of the execution of the waiver of conflict on the first day of trial, she also acknowledges that her and Dyer's alleged "antagonistic defenses were foreseeable," and she chose nonetheless to execute the waiver. We conclude that Newby executed a valid waiver of the conflict of interest, and the court was under no duty to further inquire.

{¶ 46} Newby suggests that an actual conflict nevertheless existed in defense counsel's dual representation based upon his failure to file a notice of self-defense for her. Newby cites store clerk Anderson's testimony that she assumed the argument she overheard was related to a "road rage incident," and Newby suggests that she (Newby) could have been a victim of the incident; she also cites witness Gibson's description of

Ware allegedly "flinching" at Newby. She asserts that Dyer contradicted defense counsel's theory that Dyer acted in self-defense when Dyer testified that Newby was not afraid of Ware and that, but for her conduct, Dyer would not have shot Ware.

{¶ 47} R.C. 2901.05(B)(1) governs self-defense and states:

(A) Every person accused of an offense is presumed innocent until proven guilty beyond a reasonable doubt, and the burden of proof for all elements of the offense is upon the prosecution. The burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an affirmative defense other than self-defense, defense of another, or defense of the accused's residence presented as described in division (B)(1) of this section, is upon the accused.

(B)(1) A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

{¶ 48} Newby's arguments about self-defense ignore the testimonial and video evidence. Newby mischaracterizes the record to suggest that Dyer blamed Newby in

testifying that she was unafraid and that, but for her conduct, he would not have shot Ware. As reflected above, Dyer testified that he acted to shield Newby from Ware, who ran at them in a manner Dyer perceived to be threatening. The evidence showed that Dyer intended to shoot Ware and acted aggressively to do so by approaching him at his truck to bridge the gap between them, while also trying to bring Newby back to her car and turning her away from the affray in a defensive manner. Whether Newby was afraid of Ware or not, she did not use force. She was charged with complicity, and the focus of her and Dyer's defense was necessarily on Dyer's conduct, not Newby's. Newby did not testify. Dyer, as the armed principal, received the self-defense instruction for them both. In other words, defense counsel had no inconsistent or divergent duties as to Dyer and Newby, who had no incompatible interests, and an actual conflict of interest is not demonstrated. In our view, it was a matter of trial strategy to argue self-defense on behalf of Dyer only, and ineffective assistance is not demonstrated in counsel's failure to argue self-defense on Newby's behalf.

### Egregious Conduct by Defense Counsel

{¶ 49} Newby asserts that defense counsel's multiple "improper comments" prejudiced her and denied her a fair trial. Specifically, she asserts that defense counsel 1) called Raven Anderson a liar on cross-examination; 2) improperly conceded his clients' identities during the State's direct examination of Sergeant Byron; 3) argued with Ware in the presence of the jury; and 4) that the cross-examination of Sergeant DeWine and other general statements made during closing arguments regarding DeWine were improper and prejudicial. According to Newby, defense counsel "knew his conduct was unprofessional,"

and "his egregious conduct backfired" as evidenced by the fact that he asked the jurors not to hold their dislike of him against Newby and Dyer. She argues that defense counsel's repeated inappropriate comments and abusive tactics are a sufficient basis for a new trial. We will first describe each instance cited by Newby.

1.

{¶ 50} During Anderson's cross-examination regarding a prior meeting with the prosecutor, defense counsel asked her if the prosecutor said, "Hey Raven, we have court on Tuesday; or did they say: Hey, Raven, let's talk about your testimony." Defense counsel advised Anderson, "It's not a trick question. It's okay to admit that you cooperated with the prosecutor." Anderson admitted meeting with the prosecutor and, before she could finish her response, defense counsel accused her of lying, which she denied. The court admonished defense counsel not to call a witness a liar or to treat a witness like that in front of the jury. Defense counsel responded that he "should be able to ask a witness if she's lying. That's why we have cross examination." The court then advised defense counsel to proceed with questioning Anderson.

{¶ 51} Further, while viewing the McDonald's video with Anderson and suggesting that Ware behaved in a threatening manner toward Dyer, defense counsel inquired of her, "Please tell me you see that. Come on. We're at the 1:49 mark. You see that individual there, right?" Anderson responded, "I see something there, yes, sir." When Anderson denied knowing the identity of the person in the video, defense counsel responded, "Because it wouldn't help your case if you told the truth - -". The court again admonished defense counsel saying: "[Defense Counsel], heaven forbid, all I'm asking

you to do is ask questions and not editorialize during this period. She's your witness at this point. Ask questions."

2.

{¶ 52} During Sgt. Byron's direct testimony regarding the process of administering the photo array to Ware, defense counsel stated, "Your Honor, again, we'd stipulate. We aren't disputing identity. My guys were there." On cross-examination of Byron by defense counsel, the State objected to questioning about Byron's involvement in the investigation, noting that Byron testified that he had been a blind administrator and his only involvement had been to show the photo array to Ware. The State asserted, "I don't understand why he keeps asking questions digging further and further into his involvement. [Byron] stated his involvement." The court advised defense counsel, "the Sergeant has already stated what his involvement was here, what information he has as part of the investigation. He wasn't the investigator in this matter."

3.

{¶ 53} Newby also cites multiple exchanges during defense counsel's cross-examination of Ware related to a video Ware posted on Facebook about the shooting that he made while in the hospital. Defense counsel asked Ware if he tried to justify his behavior on the night of the incident in the Facebook video, and Ware said no. Then the following exchange occurred:

Q. Would you agree now, to sum this up, that in your Facebook video, that you posted unsolicited to the public, to brag, you put in there it ain't nobody's fault; I'm not even mad at them; I forgive them from the bottom of my heart.

A. I do forgive them, * * *

* * *

Q. You say it ain't nobody's fault. You accepted responsibility. It's okay to accept responsibility, sir. Jesus would do it, right? Tell the truth. Book of Atonements. All you got to do to be righteous is tell the truth. Tell the truth.

A. I am telling the truth.

Q. And the truth is that you said it wasn't nobody's fault but now today [it] is. * * *

* * *

Q. My ego told me to follow them and that got me shot. You said that on your Facebook, correct?

A. Correct.

Q. I could have went on and continued on with my own path. You said that as well, didn't you?

A. Yeah.

Q. I wasn't about to do anything to her, none of that, nor him.

A. Yeah.

Q. Although we have three witnesses saying that you lunged or flinched at them. That didn't happen?

A. Is that cause for me being shot?

Q. Sir, if you were chased, if you flinched at them and went after them

absolutely. Quite frankly, you should have got shot the moment you stepped out of that truck.

* * *

THE COURT: I again am going to instruct the jury to disregard [Defense Counsel's] editorializing comments to you. That is not evidence, should not be considered as evidence, and you are hereby to forget and to not consider [Defense Counsel's statements.]

4.

{¶ 54} Finally, regarding Det. DeWine, Newby points to the following exchange on cross-examination:

Q. So basically, what you're doing is you're sitting here, you're observing all the information, and getting prepared on how you can put it together for the jury, right? 'Cause you're the last guy.

A. I'm the last guy.

Q. And is it fair to say that your purpose of sitting there also is maybe you can get a weak lawyer and intimidate him?

A. No, no.

Q. Would you agree you gave me a nice hard stare down a few minutes ago before our break?

A. I would say yes.

Q. And you called me a f****** a**hole, right?

A. I believe so.

{¶ 55} Newby also directs our attention to a portion of defense counsel's closing argument:

Undisputed, Ms. Newby did not shoot. Undisputed, it's not her gun. Undisputed, she never handed him the gun. No inference or no evidence whatsoever, let's kill the guy, shoot the guy, nothing like that. That's why these State's witnesses are loosey-goosey. That's why they stick with the word "shoot." That's why you compare the week before, just threw it in there. Don't forget to say "shoot." We got to get Newby; we got to get Newby. Whatever.

Ladies and gentlemen, I don't even have a word. Usually I use the word "overcharge." I don't even have a word for what they did to Ms. Newby. I think it's a tragedy. It's shameful. It has to make you lose distrust [sic] in our system. And so you ask yourself, ew, they fled. They didn't come back. Do you guys not see why? Look how the State treated my clients. Look at the evidence they had. Look at their lead detective. Cussing at me because I brought in evidence that he didn't want us to see? How does that not scare you as a human being?

See you guys live - - there's a thing called white privilege. I hate that word. It's called elite privilege. People in power get away with stuff. Could you imagine if I cussed out that lead detective? * * * Nothing happens to them. Because that's the DeWines for you. Who cares about evidence? We're kings. We can do what we want; and if you don't like it,

we'll knock you down. We have a narrative, and that's what we're gonna do. You saw it with the pandemic. You see it here. Well, no evidence. What happened to COVID? Well, the election, that's it. Where's COVID? I thought - - remember that one year everything got shut down? Well, one individual, DeWine, shut down this whole state.

[THE PROSECUTOR]: Objection, Your Honor.

THE COURT: [Defense Counsel.]

[DEFENSE COUNSEL]: Okay. I'll move on.

\* \* \*

[DEFENSE COUNSEL]: Ladies and gentlemen, let me make another thing clear to you. I will concede something. I agree that if you believe that the dispute was over and [Ware] is walking back to his car and he's like, you know what, I'm done with these kids and he walks back to his car and he gets shot, I concede Mr. Dyer's guilty. Ms. Newby definitely is not, but I will concede that. \* \* \*

**{¶ 56}** Again, defense counsel's theory of the case was that Dyer had acted in defense of himself and Newby after a road rage incident developed into a face-to-face altercation at the Speedway, where Ware charged at Dyer and caused Dyer to fear for his life and Newby's, such that he justifiably shot Ware. The instances cited by Newby above were matters of trial strategy that we will not second guess in hindsight. After Anderson testified that she heard Newby threaten to shoot someone and then appear to escalate the altercation, defense counsel attempted to impugn her credibility by

suggesting that she was an agent of the State. Further, to contest the identity of Newby and Dyer would have run afoul of defense counsel's theory that they were both present and acted in self-defense.

**{¶ 57}** Regarding the Facebook video, again, during defense counsel's cross-examination of Ware, he attempted to impugn Ware's direct testimony that he was not at fault with the Facebook video by suggesting that Ware made the video to justify his alleged threatening conduct. The court instructed the jury to disregard defense counsel's editorializing comments, and "[c]urative instructions are generally viewed as sufficient to remedy the risk of undue prejudice." *State v. Gray*, 2d Dist. Darke No. 2019-CA-7, 2020-Ohio-1402, ¶ 48, citing *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 24; *State v. Wharton*, 4th Dist. Ross No. 09CA3132, 2010-Ohio-4775, ¶ 26-28. "Juries are presumed to follow instructions." *Gray* at ¶ 48, citing *State v. Jones*, 90 Ohio St.3d 403, 414, 739 N.E.2d 300 (2000). Regarding defense counsel's comments during closing argument about Det. DeWine, we note that the jury was instructed that closing arguments are not evidence. Finally, we note that even if we were to conclude that defense counsel's conduct fell below an objective standard of reasonableness, Newby has not established prejudice given the overwhelming evidence that she was complicit in the offenses against Ware. There was no ineffective assistance of counsel.

**{¶ 58}** Newby's first assignment of error is overruled.

### Evid.R. 404(B) and Inferior Offense Instruction

**{¶ 59}** Newby's second assignment of error is as follows:

THE TRIAL COURT ABUSED ITS DISCRETION BY EXCLUDING EVIDENCE OF THE VICTIM'S PRIOR RECORD AND REFUSING TO INSTRUCT THE JURY ON INFERIOR OFFENSES, BOTH OF WHICH PREJUDICED APPELLANT'S RIGHT TO A FAIR TRIAL PURSUANT TO THE FIFTH AND SIXTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION.

**{¶ 60}** Newby first argues that the trial court's exclusion of evidence of the victim's prior speeding record and the Facebook video he made was unreasonable. She asserts that the State opened the door to evidence of Ware's habitual speeding and to his "spiritual journey," which she contends was indicative of a "demi-god personality." She also argues that the speeding record and Facebook video were relevant to Ware's dangerousness and provocation. Finally, Newby argues that the trial court erred in failing to instruct the jury on the "inferior degree offense" of aggravated assault because there was evidence of the mitigating element of serious provocation.

**{¶ 61}** The State responds that Ware's prior driving record had no bearing on the circumstances in the case, that the use of prior bad acts is prohibited by Evid.R. 404(B), and that the Facebook video was hearsay evidence that did not fall within any exception. The State argues that Dyer's alleged fear of Ware was not sufficient to establish a sudden fit of passion or rage.

**{¶ 62}** In reply, Newby asserts that Ware's driving record was admissible under Evid.R. 404(A)(2) as "evidence of a pertinent trait of the victim's character." She argues that the Facebook video should not have been excluded because it was an admission by

a party opponent, a present sense impression, and/or a recorded recollection, all of which are admissible under Evid.R. 801(D)(2) or Evid.R. 803(1) or (5). She asserts that she was entitled to the lesser included offense instruction because Ware tailed her, cut her off, and followed her to the Speedway to confront her.

### Admission of Speeding Record and Facebook video

{¶ 63} "A trial court has broad discretion to admit or exclude evidence, and its exercise of that discretion will not be disturbed on appeal absent an abuse of discretion." *State v. Hunt*, 2d Dist. Darke No. 2018-CA-9, 2019-Ohio-2352, ¶ 27. A trial court abuses its discretion if it makes an unreasonable, unconscionable, or arbitrary decision. *Id.*

{¶ 64} To be relevant, evidence must have a "tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Evid.R. 401. In other words, there must be some probative value to the evidence. Generally, relevant evidence is admissible. Evid.R. 402.

{¶ 65} Defense counsel asked Ware if it was true that he had had seven speeding tickets, and the State objected; the trial court sustained the objection and determined that there was no relevancy to Ware's speeding record. The trial court did not abuse its discretion in concluding that Ware's history of speeding violations prior to the shooting was not relevant to any fact of consequence at trial.

{¶ 66} When Ware denied making certain alleged admissions in the Facebook video, defense counsel suggested excusing the jury so that counsel could play the video for Ware in an attempt the refresh his memory, and then if Ware's memory was not

refreshed, counsel would seek to impeach him with the video. The court excused the jury so defense counsel could refresh Ware's memory with his prior statements in the Facebook video. Defense counsel played several sections from the video for Ware, during which the court advised defense counsel, "You have to give him an opportunity to answer the question before you can say, well, didn't I just refresh your memory." Defense counsel then advised the court that he did not plan to admit the video as an exhibit but "was just using it as I would a police report or a body cam video."

{¶ 67} Given that defense counsel acknowledged that he did not intend to admit the Facebook video into evidence, Newby's argument that the court erred in failing to admit it is belied by the record. Further, defense counsel was able to adduce Ware's alleged "admissions" in the video as set forth in Newby's first assignment of error.

### Jury Instruction on Aggravated Assault

{¶ 68} "A trial court has broad discretion to decide how to fashion jury instructions, but it must 'fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder.' " *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, 29 N.E.3d 939, ¶ 46, quoting *State v. Comen*, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus. "A defendant is only entitled to have his proposed jury instructions given when they are correct statements of the law, pertinent to the evidence in the record or to material issues, and are timely presented and not already included in the substance of the jury charge." *State v. Elliott*, 2d Dist. Montgomery No. 26104, 2014-Ohio-4958, ¶ 23, citing *State v. Guster*, 66 Ohio St.2d 266, 269, 421 N.E.2d 157 (1981). "When reviewing the trial court's

jury instructions, the proper standard of review is whether the trial court's decision to give or exclude a particular jury instruction was an abuse of discretion under the facts and circumstances of the case." (Citation omitted.) *State v. Fair*, 2d Dist. Montgomery No. 24388, 2011-Ohio-4454, ¶ 65.

{¶ 69} In deciding whether to provide a lesser-included or inferior-offense instruction, a trial court must find sufficient evidence to allow a jury to reasonably reject the greater offense and to find a defendant guilty on a lesser-included or inferior-degree offense. *State v. Ferrell*, 2020-Ohio-6879, 165 N.E.3d 743, ¶ 35 (10th Dist.). When the evidence pertaining to a lesser-included offense or inferior-degree offense meets this test, a trial court must instruct the jury on the lesser-included or inferior-degree offense. *State v. Conley*, 2015-Ohio-2553, 43 N.E.3d 775, ¶ 32 (2d Dist.).

{¶ 70} In *State v. Dixon*, 2d Dist. Greene No. 2021-CA-29, 2022-Ohio-3157, the defendant sought to have the jury instructed on aggravated assault as an inferior-degree offense to felonious assault and on voluntary manslaughter as an inferior-degree offense to murder. On appeal, we noted "that aggravated assault is an inferior-degree offense to felonious assault and that voluntary manslaughter is an inferior-degree offense to murder," because "aggravated assault and voluntary manslaughter both contain an additional mitigating element of 'serious provocation.' " *Id.* at ¶ 21, citing *State v. Rid*er, 2d Dist. Champaign No. 2021-CA-12, 2022-Ohio-1964, ¶ 39-40. "In other words, the greater-degree and inferior-degree offenses [were] similar except aggravated assault and voluntary manslaughter require[d] proof that a defendant acted under the influence of sudden passion or in a fit of rage brought about by serious provocation." *Id.,* citing *State*

*v. Miller*, 2d Dist. Montgomery No. 29099, 2022-Ohio-213, ¶ 16; *State v. Robinson*, 2d Dist. Clark No. 2021-CA-3, 2021-Ohio-3255, ¶ 11. Thus, Newby correctly asserts that aggravated assault is an inferior-degree offense of felonious assault.

**{¶ 71}** "The test for whether a serious provocation occurred and whether a defendant acted under the influence of sudden passion or in a fit of rage includes objective and subjective components." *Dixon* at ¶ 21, citing *Robinson* at ¶ 12. "The provocation must be sufficient to arouse an ordinary person beyond the power of his control, and the defendant in fact must have acted under the influence of sudden passion or in a fit of rage." *Id.* "Classic examples of serious provocation are assault and battery, mutual combat, illegal arrest and discovering a spouse in the act of adultery." *State v. Thornton*, 2d Dist. Montgomery No. 20652, 2005-Ohio-3744, citing *State v. Shane*, 63 Ohio St.3d 630, 635, 590 N.E.2d 272 (1992). Fear " 'alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage.' " *Dixon* at ¶ 23, quoting *Miller* at ¶ 18, quoting *State v. Mack*, 82 Ohio St.3d 198, 201, 694 N.E.2d 1328 (1998).

**{¶ 72}** "This court has recognized that a self-defense argument generally is inconsistent with a serious-provocation theory." *Dixon* at ¶ 22, citing *State v. Brown*, 2d Dist. Montgomery No. 27738, 2018-Ohio-3068, ¶ 47. Accordingly, "self-defense and aggravated-assault or voluntary-manslaughter instructions are incompatible in most cases," but we "recognized in *Brown* that the two theories conceivably might be compatible where a defendant is found to have exceeded the degree of force necessary to defend himself because he acted out of passion or rage." *Id.*

{¶ 73} On this record, the trial court reasonably concluded that Ware had not engaged in any serious provocation and that neither Newby nor Dyer had acted under the influence of sudden passion or in a fit of rage so as to warrant the requested instruction on aggravated assault. Dyer's alleged fear of Ware was insufficient. Further, Ware was unarmed and was shot while he was turning away after being pursued by Newby and Dyer. Finally, Newby's reliance upon Gibson's and Eldridge's testimony is misplaced. Eldridge observed Newby "still rattling on about something" after Ware was shot, and Gibson denied that Ware had lunged at Dyer or made any threats towards him. Gibson did not believe the "flinch" by Ware was an "aggressive approach." The trial court did not abuse its discretion in not giving an instruction on aggravated assault.

{¶ 74} Newby's second assignment of error is overruled.

## Manifest Weight and Sufficiency

{¶ 75} We will consider Newby's third and fourth assignments of error together:

THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN THE VERDICT OF COMPLICITY WHERE THE VICTIM FAILED TO IDENTIFY APPELLANT IN OPEN COURT, SHE HAD NO WEAPON, DID NOT CAUSE HARM, AND WAS MERELY 'STANDING HER GROUND' UNDER SERIOUS PROVOCATION.

THE MANIFEST WEIGHT OF THE EVIDENCE INDICATED THAT APPELLANT WAS "STANDING HER GROUND" IN A FIGHT OR FLIGHT SITUATION UNDER SERIOUS PROVOCATION.

{¶ 76} In her third assignment, Newby argues that Ware "admitted that his ego was

responsible for the shooting," and he could have chosen not to confront Newby. As such, Newby asserts that she did not cause harm to Ware; rather, he caused harm to himself by pursuing and confronting her and Dyer. In her fourth assignment, Newby asserts that she was " 'standing her ground' in a fight or flight situation under serious provocation," and it was not her burden to introduce evidence that Dyer had acted in self-defense.

{¶ 77} According to the State, Newby incited the situation, escalated it by spitting on Ware, and then aided in Dyer's escape from the scene. The State argues that the "only thing that could weigh against the evidence" would have been proof of Dyer's claim that he acted in self-defense, but the jury credited Ware's testimony over Dyer's. According to the State, Ware was "in the middle of a turn to go back to his truck" when he was shot, which was inconsistent with self-defense.

{¶ 78} In reply, Newby argues that she did not engage in conduct that, if successful, would have resulted in purposely causing Ware's death. She asserts that "a greater amount of credible evidence" supported her acquittal when all of the evidence of Ware's aggressive conduct toward her is considered.

{¶ 79} " 'Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency.' " *State v. Curtis*, 2020-Ohio-4152, 157 N.E.3d 879, ¶ 44 (2d Dist.), quoting *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11, " '[A] determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency.' " *Id.*, quoting *State v. Braxton*, 10th Dist. Franklin

No. 04AP-725, 2005-Ohio-2198, ¶ 15.

{¶ 80} "* * * [A] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12. " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [factfinder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). *See also Curtis* at ¶ 19.

{¶ 81} The credibility of the witnesses and the weight to be given to their testimony are primarily matters for the trier of fact to resolve. *State v. Griffith*, 2d Dist. Montgomery No. 26451, 2015-Ohio-4112, ¶ 28, citing *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). An

appellate court will not substitute its judgment for that of the trier of fact on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *State v. Bradley*, 2d Dist. Champaign No. 1997-CA-03, 1997 WL 691510, *4 (Oct. 24, 1997).

{¶ 82} R.C. 2903.11(A)(2) proscribes felonious assault: No person shall knowingly "(2) Cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." R.C. 2903.02(A) proscribes murder: "No person shall purposely cause the death of another * * *." R.C. 2923.02(A) defines attempt it states: "No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense." A person acts with "purpose" when he or she has the "specific intention to cause a certain result, or * * * to engage in conduct of [a certain] nature." R.C. 2901.22(A).

{¶ 83} R.C. 2923.03(A)(2) extends criminal liability to those who "[a]id or abet another in committing the offense" while "acting with the kind of culpability required for the commission of an offense." "Whoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender." R.C. 2923.03(F). "To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." *State v.*

*Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796 (2001). " '[T]he mere presence of an accused at the scene of a crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor.' " *Id.* at 243, quoting *State v. Widner*, 69 Ohio St.2d 267, 269, 431 N.E.2d 1025 (1982). However, participation in criminal intent " 'may be inferred from presence, companionship and conduct before and after the offense is committed.' " *Id.* at 245, quoting *State v. Pruett*, 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist.1971). A "gun is considered a 'deadly weapon,' and therefore its discharge in another's direction supports an inference that the shooter harbored the specific intent to kill." *State v. McRae*, 1st Dist. Hamilton No. C-180669, 2020-Ohio-773, ¶ 11.

{¶ 84} As a preliminary matter, we note that the record reflects that Ware identified Newby in open court. Newby mischaracterizes the record to argue otherwise.

{¶ 85} That Newby did not have a weapon or cause harm to Ware herself were irrelevant factors under a theory of complicity. Newby and Dyer were in a relationship at the time of the shooting and he was a passenger in her vehicle when the incident began. Newby acted angrily before the parties reached the Speedway, and multiple witnesses then observed and/or heard Newby aggressively arguing with Ware. Anderson and Miller heard a female voice, undoubtedly Newby, say she was going to shoot someone during the argument. Ware testified that Newby had threatened to kill him. After Ware moved his truck forward and got out, Newby and Dyer moved toward him together until Dyer acted to prevent Newby from continuing forward by grabbing her or spinning her around. Other than Dyer, none of the witnesses testified that Ware had threatened Newby or Dyer. Ware was shot near his truck. The jury credited the testimony of the

State's witnesses over Dyer's, and we defer to their credibility assessment. After Dyer shot Ware, Newby drove him from the scene, further confirming her criminal intent in participating, aiding, and cooperating with him in the offenses against Ware.

{¶ 86} Finally, the Speedway and McDonald's surveillance videos did not lack evidentiary quality, as Newby asserts. In the videos, Newby's Honda and Ware's truck were positioned at the pumps consistent with the witnesses' testimony, and Ware's truck could be seen moving forward and stopping in the parking lot a distance from the Honda. A figure in a white shirt (consistent with all the State's witnesses' descriptions of Dyer) was depicted approaching the truck and then returning to the Honda before driving away.

{¶ 87} Even without the videos, overwhelming evidence established Newby's guilt. Beyond her mere presence at the Speedway, the jury reasonably concluded that Newby had shared Dyer's criminal intent to commit the offenses and was complicit in Dyer's conduct. Based upon the foregoing, we cannot conclude that the jury lost its way. Legally sufficient evidence supported Newby's conviction, and the conviction was not against the manifest weight of the evidence.

{¶ 88} Newby's third and fourth assignments of error are overruled.

{¶ 89} The judgment of the trial court is affirmed.

. . . . . . . . . . . . .

EPLEY, P.J. and TUCKER, J., concur.